IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TINA PRYOR,

                Plaintiff,

vs.                              Case No. 11-1292-SAC

MICHAEL J. ASTRUE,
Commissioner of
Social Security,

                Defendant.

MEMORANDUM AND ORDER

This is an action reviewing the final decision of the Commissioner of Social Security denying the plaintiff disability insurance benefits and supplemental security income payments. The matter has been fully briefed by the parties.

**I.  General legal standards**

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  The court should review the Commissioner's decision to determine only whether the decision was supported by substantial evidence and whether the Commissioner applied the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable mind might accept to support the

1

conclusion.  The determination of whether substantial evidence
supports the Commissioner's decision is not simply a quantitative
exercise, for evidence is not substantial if it is overwhelmed by
other evidence or if it really constitutes mere conclusion.  Ray
v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).  Although the court
is not to reweigh the evidence, the findings of the Commissioner
will not be mechanically accepted.  Nor will the findings be
affirmed by isolating facts and labeling them substantial
evidence, as the court must scrutinize the entire record in
determining whether the Commissioner's conclusions are rational.
Graham v. Sullivan, 794 F. Supp. 1045, 1047 (D. Kan. 1992).  The
court should examine the record as a whole, including whatever in
the record fairly detracts from the weight of the Commissioner's
decision and, on that basis, determine if the substantiality of
the evidence test has been met.  Glenn, 21 F.3d at 984.

     The Social Security Act provides that an individual shall be
determined to be under a disability only if the claimant can
establish that they have a physical or mental impairment expected
to result in death or last for a continuous period of twelve
months which prevents the claimant from engaging in substantial
gainful activity (SGA).  The claimant's physical or mental
impairment or impairments must be of such severity that they are
not only unable to perform their previous work but cannot,
considering their age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the

national economy.   42 U.S.C. § 423(d).

The Commissioner has established a five-step sequential

evaluation process to determine disability.  If at any step a

finding of disability or non-disability can be made, the

Commissioner will not review the claim further.  At step one, the

agency will find non-disability unless the claimant can show that

he or she is not working at a "substantial gainful activity."  At

step two, the agency will find non-disability unless the claimant

shows that he or she has a "severe impairment," which is defined

as any "impairment or combination of impairments which

significantly limits [the claimant's] physical or mental ability

to do basic work activities."  At step three, the agency

determines whether the impairment which enabled the claimant to

survive step two is on the list of impairments presumed severe

enough to render one disabled.  If the claimant's impairment does

not meet or equal a listed impairment, the inquiry proceeds to

step four, at which the agency assesses whether the claimant can

do his or her previous work; unless the claimant shows that he or

she cannot perform their previous work, they are determined not

to be disabled.  If the claimant survives step four, the fifth

and final step requires the agency to consider vocational factors

(the claimant's age, education, and past work experience) and to

determine whether the claimant is capable of performing other

jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 124 S. Ct. 376, 379-380 (2003).

The claimant bears the burden of proof through step four of
the analysis.  Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir.
1993).  At step five, the burden shifts to the Commissioner to
show that the claimant can perform other work that exists in the
national economy.  Nielson, 992 F.2d at 1120; Thompson v.
Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).  The Commissioner
meets this burden if the decision is supported by substantial
evidence.  Thompson, 987 F.2d at 1487.

Before going from step three to step four, the agency will
assess the claimant's residual functional capacity (RFC).  This
RFC assessment is used to evaluate the claim at both step four
and step five.  20 C.F.R. §§ 404.1520(a)(4), 404.1520(e,f,g);
416.920(a)(4), 416.920(e,f,g).

## II.  History of case

On December 31, 2009, administrative law judge (ALJ) Michael
A. Lehr issued his decision (R. at 9-21).  Plaintiff alleges that
she has been disabled since May 20, 2008 (R. at 9).  Plaintiff is
insured for disability insurance benefits through December 31,
2011 (R. at 11).  At step one, the ALJ found that plaintiff has
not engaged in substantial gainful activity since plaintiff's
alleged onset date (R. at 11).  At step two, the ALJ found that
plaintiff had the following severe impairments: diabetes,

obesity, borderline intellectual functioning, carpal tunnel
syndrome, degenerative joint disease of the lumbar spine,
degenerative joint disease of the left knee, peripheral artery
disease, and asthma (R. at 11).  At step three, the ALJ
determined that plaintiff's impairments do not meet or equal a
listed impairment (R. at 12).  After determining plaintiff's RFC
(R. at 16), the ALJ determined at step four that plaintiff was
unable to perform past relevant work (R. at 19).  At step five,
the ALJ determined that other jobs exist in significant numbers
in the national economy that plaintiff could perform (R. at 20-
21).  Therefore, the ALJ concluded that plaintiff was not
disabled (R. at 21).

**III.  Did the ALJ make RFC findings in compliance with the
requirements of SSR 96-8p?**

     According to SSR 96-8p, the RFC assessment "must include a
narrative discussion describing how the evidence supports each
conclusion, citing specific medical facts...and nonmedical
evidence."  The ALJ must explain how any material inconsistencies
or ambiguities in the evidence in the case record were considered
and resolved.  The RFC assessment must always consider and
address medical source opinions.  If the RFC assessment conflicts
with an opinion from a medical source, the ALJ must explain why
the opinion was not adopted.  SSR 96-8p, 1996 WL 374184 at *7.
SSR rulings are binding on an ALJ.  20 C.F.R. § 402.35(b)(1);

Sullivan v. Zebley, 493 U.S. 521, 530 n.9, 110 S. Ct. 885, 891 n.9, 107 L. Ed.2d 967 (1990); Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir. 1993).  When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that his RFC conclusions are not supported by substantial evidence.  See Southard v. Barnhart, 72 Fed. Appx. 781, 784-785 (10th Cir. July 28, 2003).  The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review; the ALJ is charged with carefully considering all of the relevant evidence and linking his findings to specific evidence. Spicer v. Barnhart, 64 Fed. Appx. 173, 177-178 (10th Cir. May 5, 2003).  It is insufficient for the ALJ to only generally discuss the evidence, but fail to relate that evidence to his conclusions.  Cruse v. U.S. Dept. of Health & Human Services, 49 F.3d 614, 618 (10th Cir. 1995).  When the ALJ has failed to comply with SSR 96-8p because he has not linked his RFC determination with specific evidence in the record, the court cannot adequately assess whether relevant evidence supports the ALJ's RFC determination.  Such bare conclusions are beyond meaningful judicial review.  Brown v. Commissioner of the Social Security Administration, 245 F. Supp.2d 1175, 1187 (D. Kan. 2003).

     The ALJ made the following RFC findings:

> ...claimant has the residual functional
> capacity to perform a range of light work as
> defined in 20 CFR 404.1567(b) and 416.967(b).
> Specifically, the claimant is limited to
> lifting or carrying up to 20 pounds
> occasionally or 10 pounds frequently,
> standing or walking 2 hours out of 8 hour
> workday, and sitting 6 hours out of an 8 hour
> workday.  The claimant is able to
> occasionally climb, balance, stoop, kneel,
> crouch, crawl, but should never climb
> ladders, ropes, or scaffolds.  Also, the
> claimant should not perform rapid, repetitive
> gross handling.  The claimant should avoid
> concentrated exposure to temperature extremes
> or vibration and avoid moderate exposure to
> pulmonary irritants such as dusts or odors.
> Further, the claimant is limited to simple,
> unskilled work.

(R. at 16).

On October 14, 2008, Dr. Subramanian performed a physical consultative examination on the plaintiff.  Dr. Subramanian found that plaintiff did not have any disability in sitting, standing, handling objects, hearing, speaking or traveling, but may have a disability in lifting, carrying and walking long distances (R. at 326-328).  Because of other medical evidence in the record showing limitations in her ability to stand and/or walk, and in her ability to perform rapid, repetitive gross handling because of carpal tunnel syndrome, the ALJ gave Dr. Subramanian's opinions limited weight (R. at 18).

On March 3, 2009, Dr. Davis also performed a physical consultative examination on the plaintiff (R. at 372-382).  His conclusions included the following:

7

> Based on History and Physical examination,
> this individual does exhibit symptoms and
> signs of significant carpal tunnel syndrome
> in the left upper extremity and right upper
> extremity.  This individual would benefit
> from further electrodiagnostic evaluation to
> determine her true restrictive status.  This
> patient currently would likely possess mild
> restrictions with handling secondary to her
> suspected carpal tunnel syndrome.
>
> .........
>
> There is evidence for mild restriction of the
> patient's tolerance for handling objects.
> There is no evidence for restrictions of the
> patient's tolerance for stooping, bending,
> reaching, sitting, standing, moving about,
> lifting, carrying, or traveling.  The patient
> was able to hear and understand normal
> conversational speech without difficulty.
> There was no need for an assistive device for
> ambulation.  Gross manipulation is normal.

(R. at 381).  While the ALJ concurred that plaintiff is limited

in her ability to handle based on carpal tunnel syndrome, the ALJ

noted that Dr. Davis placed no restrictions on plaintiff because

of her obesity or history of peripheral artery disease.

Therefore, he accorded little weight to his opinions (R. at 18).

     The record also contains a physical RFC assessment by Dr.

Goering, and dated March 18, 2009 (R. at 383-390).  Dr. Goering

did not examine the plaintiff, but based on his opinions on a

review of the records (R. at 18).  Dr. Goering limited plaintiff

to lifting 20 pounds occasionally and 10 pounds frequently; he

also indicated that standing/walking and sitting could each be

performed by the plaintiff for 6 hours a day (R. at 384).  He

opined that plaintiff could never climb ladders, ropes or
scaffolds (R. at 385), and that she should avoid rapid and
repetitive hand movements due to bilateral carpal tunnel syndrome
(R. at 386).  He further opined that she should avoid
concentrated exposure to extreme cold and vibration (R. at 387).
The ALJ stated that Dr. Goering supported his opinions by citing
to mild findings reflected in the medical records (R. at 19,
390).  The ALJ therefore accorded significant weight to the
opinions of Dr. Goering (R. at 19).

Plaintiff argues that the ALJ should have order further
testing in light of the opinion of Dr. Davis that plaintiff
"would benefit from further electrodiagnostic evaluation to
determine her true restrictive status" (R. at 381).  However, Dr.
Davis stated in the very next sentence that plaintiff would
"likely possess mild restrictions with handling secondary to her
suspected carpal tunnel syndrome" (R. at 381).  In his testing,
Dr. Davis stated that plaintiff had normal grip strength, was
able to touch her fingertips with her thumb, open a door and hold
a pencil without difficulty.  She was also able to make an okay
sign and a fist without difficulty, and had a full range of
motion of her bilateral upper extremities (R. at 380-381).  Dr.
Davis concluded that the evidence indicated a "mild restriction
of the patient's tolerance for handling objects" (R. at 381).
Dr. Goering, after his review of the records, opined that

9

plaintiff should avoid "rapid & repetitive hand movements" because of bilateral carpal tunnel syndrome (R. at 386).

Consultative medical examinations may be ordered by the ALJ when the information needed is not readily available from medical treatment sources.  20 C.F.R. §§ 404.1512(f), 404.1519a(a)(1). The Commissioner has broad latitude in ordering consultative examinations.  Nevertheless, it is clear that, where there is a direct conflict in the medical evidence requiring resolution, or where the medical evidence in the record is inconclusive, a consultative examination is often required for proper resolution of a disability claim.  Similarly, where additional tests are required to explain a diagnosis already contained in the record, resort to a consultative examination may be necessary.  There must be present some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation.  The claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists.  When the claimant has satisfied this burden in that regard, it then becomes the responsibility of the ALJ to order a consultative examination if such an examination is necessary or helpful to resolve the issue of impairment.  In a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development.  In

10

the absence of such a request by counsel, the court will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record. The ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability.  Hawkins v. Chater, 113 F.3d 1162, 1166-1168, 1169 (10th Cir. 1997; see Madrid v. Barnhart, 447 F.3d 788, 791-792 (10th Cir. 2006)(where additional tests are required to explain a diagnosis already in the record, resort to a consultative examination may be necessary).

Although Dr. Davis stated that plaintiff would benefit from further testing to determine her true restrictive status, he nonetheless opined that the evidence, including testing he performed, showed a "mild restriction" of plaintiff's tolerance for handling objects (R. at 381).  Dr. Goering, after his review of the evidence, opined that plaintiff avoid rapid and repetitive hand movements due to carpal tunnel syndrome (R. at 386).  The ALJ has broad latitude in deciding whether to order a consultative examination.  Based on the fact that two physicians were able to offer opinions regarding the extent of plaintiff's limitation in her ability to handle due to carpal tunnel syndrome, the court does not find that the ALJ erred by failing

to order a further consultative examination on plaintiff's

limitation in handling due to carpal tunnel syndrome.

The record also contains a consultative psychological

examination, dated January 29, 2008, from Dr. McCleeary, a

licensed psychologist (R. at 410-416).  At the outset of his

report, Dr. McCleeary stated the following:

> [Plaintiff] was cooperative during the test
> situation but appeared to have little
> motivation or interest in the tests.  It
> appeared she expected to fail, giving up very
> easily on every subtest, making the
> administration a less reliable reflection of
> her actual cognitive functioning.  She did
> not react differently to any of the tests,
> treating them all as equally beyond her
> abilities.

(R. at 410).  Dr. McCleeary performed an IQ test on the

plaintiff, and reported on that test as follows:

> [Plaintiff] took the WAIS-III [Wechsler Adult
> Intelligence Scales-Third Edition] and her
> results were valid and reliable for
> interpretation.  It should be noted that she
> did not appear to put forth a full effort,
> seeming to give up easily.  Her resulting
> profile might reflect a somewhat lower level
> cognitive functioning than she might
> demonstrate in everyday life...Her results
> were as follows:
>
> Verbal                61 IQ
> Performance           70 IQ
> Full Scale            62 IQ

(R. at 412).  In his summary, Dr. McCleeary stated the following:

> Evaluation previous to this testing suggested
> Borderline Intellectual Functioning.  Testing
> with WAIS-III suggested a Full Scale IQ of
> 62, which did not appear to be a highly valid

12

> measure of her actual cognitive functioning
> due to a possible lack of effort.  Her test
> results were not consistent with completing a
> CNA [certified nursing assistant] program, in
> spite of attending special education classes
> throughout her schooling.  Some of her verbal
> responses reflected a better vocabulary than
> might be estimated by her obtained IQ.

(R. at 412-413).  Dr. McCleeary had also previously noted in his

report that plaintiff mentioned that she had been in remedial

classes in school but graduated with As and Bs (R. at 410).

Based on his evaluation, Dr. McCleeary opined that plaintiff was

moderately limited in understanding, remembering and carrying out

detailed instructions (R. at 414).  He also opined that she was

only slightly limited in her ability to interact appropriately

with the public, respond appropriately to work pressures, and

respond appropriately to change in a work setting (R. at 415).[1]

The ALJ gave considerable weight to the opinions of Dr.

McCleeary (R. at 19), and limited plaintiff to simple, unskilled

work (R. at 16, 19).  The ALJ discussed the findings of Dr.

McCleeary in some detail, and concluded that the IQ scores were

not a valid assessment of plaintiff's intellectual abilities (R.

at 14).

Plaintiff argues that the ALJ should have ordered further IQ

testing because of the inconsistency in the report from Dr.

McCleeary.  Admittedly, Dr. McCleeary stated that the IQ test

---

[1]A "slight" limitation was defined on the form filled out by Dr. McCleeary as "some mild limitations in this area, but the individual can generally function well" (R. at 414).

results were valid and reliable for interpretation.  However, in

the next sentence, he stated that plaintiff did not appear to put

forth a full effort, and seemed to give up easily.  Thus, he

believed her profile might reflect a somewhat lower cognitive

functioning than she might demonstrate in everyday life (R. at

412).  Earlier in his report, Dr. McCleeary stated that it

appeared she had little motivation or interest in the tests,

expected to fail, gave up very easily on every subtest, making

the administration of the test a less reliable reflection of her

actual cognitive functioning (R. at 410).  In his summary, he

stated that the IQ test scores did not appear to be a valid

measure of her actual cognitive functions due to a possible lack

of effort.  He noted that her test results were not consistent

with completing a certified nursing assistant program; he also

noted that her verbal responses reflected a better vocabulary

than might be estimated by her obtained IQ (R. at 412-413).

     According to 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1),

the ALJ should seek additional evidence or clarification from a

medical source if the report from the medical source contains a

conflict or ambiguity that needs to be resolved.  However, the

court finds no clear conflict or ambiguity that required the ALJ

to obtain additional evidence or seek clarification.  Although

Dr. McCleeary found that the test results were valid and reliable

for interpretation, he clarified that finding by setting forth in

14

detail why he did not believe the tests were a valid measure of her actual cognitive functioning, noting her failure to put forth a full effort and seeming to give up easily.  He also noted that the test results were not consistent with completing a certified nursing assistant program, and that her verbal responses reflected a better vocabulary than might be estimated by her obtained IQ.  On these facts, the court finds that the ALJ did not err by not ordering further testing or obtaining clarification from Dr. McCleeary.[2]

In summary, the court finds that the ALJ's RFC findings were sufficiently supported by a narrative discussion describing how the evidence supported each conclusion, in accordance with SSR 96-8p.  For the reasons set forth above, there was no need on the facts of this case for the ALJ to obtain any clarification of a medical opinion, or obtain any additional mental or physical testing or evaluations.

IT IS THEREFORE ORDERED that the judgment of the Commissioner is affirmed pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Dated this 15th day of August, 2012, Topeka, Kansas.


s/ Sam A. Crow                                
Sam A. Crow, U.S. District Senior Judge

---

[2]Plaintiff's failure to put forth a full effort and seeming to give up easily on the IQ test would of itself also raise a serious question of the efficacy of ordering additional testing.